**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | : : : CIVIL ACTION NO. 1:20-cv-5777 : |
| Plaintiff, | : : |
| v. | : : |
| ROMAN BANOCZAY, JR., ROMAN BANOCZAY, SR., and BAZUR SPOL. S.R.O., | : : : : |
| Defendants. | : : : |

**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL**
**MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF**

Plaintiff Commodity Futures Trading Commission (the "CFTC" or "Commission") alleges as follows:

## I.    SUMMARY

1.      From at least January 16, 2018 through February 12, 2018 (the "Relevant Period"), Defendant Roman Banoczay, Jr. ("Banoczay") engaged in a manipulative and deceptive scheme by "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution) while placing orders for and trading crude oil futures contracts on the New York Mercantile Exchange. Banoczay was an active trader in the crude oil futures markets since 2013, and his trading was generally profitable. But in January 2018, he experienced a string of sudden and substantial losses, losing more than one million dollars over three trading days, and nearly wiping out the profits he had earned trading during the entirety of 2017. Amid these mounting losses, Banoczay developed the spoofing strategy he executed during the Relevant

Period.  After spoofing an average of twenty-seven times per day during the second half of January, Banoczay ramped up his activity in February, spoofing an average of over 200 times per day.  This activity reached a crescendo on February 12, 2018, when Banoczay spoofed the market more than 700 times on a single day.  In response to this trading activity, Banoczay's futures commission merchant put a hold on his accounts, and he ceased trading.  Nevertheless, with the aid of his spoofing, Banoczay was able to recoup some of his earlier losses.  For example, during his most intense spate of spoofing, he earned more than $332,000 in profits over eight days of trading.

2.      Banoczay placed orders and traded through accounts held by his father, Defendant Roman Banoczay, Sr. ("Banoczay Sr."), and by their family's corporation, Defendant BAZUR Spol. S.R.O. ("BAZUR") (collectively with Banoczay and Banoczay Sr., "Defendants").

3.      On more than 2,000 occasions during the Relevant Period, Banoczay placed large orders that he intended to cancel before execution.  In placing these large orders, Banoczay sent false signals of supply and demand to the market.  These false signals were designed to deceive market participants into executing the orders that Banoczay actually wanted filled, and allowed Banoczay to fill those orders sooner, at a better price, and/or in larger quantities than they otherwise would have been filled.

4.      By virtue of this conduct, as further alleged herein, during the Relevant Period, Banoczay engaged in acts and practices that violated Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2018).

5.      By virtue of this conduct, as further alleged herein, during the Relevant Period, Banoczay engaged in acts and practices that violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1)

(2018), and Commission Regulation ("Regulation") 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2019).

6.     Defendants Banoczay Sr. and BAZUR are strictly liable for these violations under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2019), because Banoczay served as their agent and committed these violations within the scope of his agency.

7.     The Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), to enjoin Defendants' unlawful acts and practices and to compel Defendants' compliance with the Act and Regulations.  In addition, the Commission seeks civil monetary penalties and other equitable relief, including but not limited to disgorgement and trading and registration prohibitions, as the Court deems necessary and appropriate.

## II.   <u>JURISDICTION AND VENUE</u>

8.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018), which provides that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress.  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), authorizes the Commission to seek injunctive relief in any proper district court of the United States against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

9.     Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because Defendants transacted business in the Northern District of Illinois by trading commodity futures on the Chicago Mercantile Exchange through its Globex trading platform, which is located in

this District.  In addition, the acts and practices in violation of the Act and Regulations occurred within this District.

### III.  PARTIES

10.     Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the rules, Regulations, and orders promulgated thereunder.  One of its core responsibilities is to protect the public interest by deterring and preventing disruptions to market integrity.  *See* 7 U.S.C. § 5(b) (2018).  The Commission is headquartered at 1155 21st Street NW, Washington, DC 20581.

11.     Defendant **Roman Banoczay, Jr.** is a resident of Bratislava, Slovakia and is Banoczay Sr.'s son.  During the Relevant Period, Banoczay directed the trading of commodity futures through accounts held by Banoczay Sr. and BAZUR.  Upon information and belief, Banoczay was authorized to do so by Banoczay Sr. and BAZUR.

12.     Defendant **BAZUR spol. s.r.o.** is a Slovak business entity based in Bratislava, Slovakia.

13.     Defendant **Roman Banoczay, Sr.** is a resident of Bratislava, Slovakia.  During the Relevant Period, Banoczay Sr. served as CEO and statutory authorized representative of BAZUR.

### IV.  OTHER RELEVANT ENTITIES

14.     The **New York Mercantile Exchange** ("NYMEX") is a commodity exchange that is registered with the CFTC as a designated contract market under 7 U.S.C. § 7, and defined as a "registered entity" under 7 U.S.C. § 1a(40).  Among other commodities, NYMEX lists crude oil futures for trading.  NYMEX's headquarters is located in New York, New York.

15.     **CME Group Inc.** ("CME") is a Delaware corporation with its principal place of business in Chicago, Illinois.  CME is the holding company that owns NYMEX and operates (including during the Relevant Period) an electronic trading platform known as Globex located in Aurora, Illinois.

## V.   LEGAL BACKGROUND

### A.    Spoofing

16.     Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2018), provides that "[i]t shall be unlawful for any person to engage in any trading, practice, or conduct on or subject to the rules of a registered entity that . . . is, is of the character of, or is commonly known to the trade as, 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)."

### B.    Manipulative or Deceptive Devices

17.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), provides that "[i]t shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate."

18.     Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019),  provides that "[i]t shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:  (1) [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; . . . [or] (3) [e]ngage, or

attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person."

## C.    Derivative Liability

19.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2019), provide that "[t]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person."

## VI.    MARKET AND PRODUCT BACKGROUND

## A.    Fundamentals of Crude Oil Futures Markets

20.    A futures contract is an agreement to buy or sell a commodity for delivery or cash settlement in the future at a specified price.  Like all commodity futures markets, the market for crude oil futures enables producers and users of crude oil to hedge the price of those commodities.  For market participants generally, the crude oil futures market serves as a principal means for investment in crude oil, which is commonly used to assume or shift price risk or to speculate on price.

21.    A futures contract traded on an exchange has standard, non-negotiable contract specifications, such as the quality, quantity, and physical delivery time and location for the given product.  The West Texas Intermediate crude oil futures contract ("Crude Oil" contract) is traded on NYMEX.  The standard contract unit for the Crude Oil contract (one "lot," in trading terminology) equals 1,000 barrels of oil.  The contract price is quoted in dollars per barrel, with a minimum price change (commonly referred to as a "tick") of $0.01 per barrel.  Because one Crude Oil contract equals 1,000 barrels, a one-tick change in the quoted price results in a $10 change in the actual price of a single lot ($0.01 per barrel x 1,000 barrels).

22.     Crude Oil contracts are traded for delivery on a monthly basis for the current calendar month, each calendar month for the next ten calendar years, and two additional contract months.  The Crude Oil contract can be traded on CME's Globex electronic trading platform between 5:00 p.m. Central Time on Sunday evening and 4:00 p.m. Central Time on Friday afternoon.[1]

**B.     Operation of CME's Electronic Trading Platform (Globex)**

23.     CME's electronic trading platform, Globex, is an open-access marketplace that allows traders to view the book of visible orders and prices for futures contracts, and enter their own orders to buy or sell futures contracts.  An "order," in the context of electronic exchange trading, is a request submitted to the exchange to buy (that is, "bid") or sell (that is, "offer" or "ask") a certain number of a specified futures contract.  An order may be for one or more lots.  Orders are entered into the exchange's order book, and when there is a willing buyer and seller for a contract at a specified price, a transaction occurs and the orders are "filled" or "executed."[2]  At any time before an order is fully filled, a trader may "cancel" the order.  When an order is canceled, the contracts that have not yet been bought or sold are pulled from the order book.

24.     When a bid or offer is submitted through Globex, it becomes part of the list of orders reflected in the "order book" for a particular futures contract.  Traders are able to see the "visible" portion of the order book (also known as "market depth") for at least ten price levels on

---

[1] All times described in this Complaint are expressed in Central Time, unless otherwise stated.

[2] CME employs a matching algorithm to match bids and offers for execution on Globex.  In certain markets, like the crude oil futures markets at issue here, the matching algorithm applies a First-In-First-Out ("FIFO") priority-in-time method to orders entered at the same price level of the order book.  The first orders placed at a price level are the first to be executed.  As a general matter, if there are multiple buy orders at a price level, the orders will be filled in the order they were placed.  The orders that are first in line to be filled at a given price level are said to be at the "front of the queue," and the last orders at a given price level are said to be at the "back of the queue."  As a general matter, the orders at the back of the queue will be filled only if all of the other orders at the same price level have already been filled.

the buy side and for at least ten price levels on the sell side for all market participants. The visible portion of the order book includes only the aggregate number of orders at each price level and the aggregate number of lots comprising those orders. The identities of the traders who placed the orders and the number of lots sought in any particular order are not visible to market participants.

25.     For example, if the "best-bid" (the highest price at which any trader is willing to buy) is 6500, and the "best-ask" (the lowest price at which any trader is willing to sell) is 6501, then on the buy side, the visible order book displays the lots available at price levels of 6500, 6499, 6498, 6497, and so forth until reaching the tenth-highest price level at 6491.[3] On the sell side, the book displays the lots available at price levels of 6501, 6502, 6503, 6504, and so forth until reaching the tenth-lowest price level at 6510. The "bid-ask spread" is the difference between the best-ask and best-bid price levels; accordingly, the bid-ask spread in the example above is 1 (6501 less 6500).

---

[3] Globex displays the price for the Crude Oil contract (and other futures contracts) without decimal points. In this example, the best bid is equal to a contract price of $65.00 per barrel, and the best-ask is equal to a contract price of $65.01 per barrel.

26. To illustrate, the chart below shows an example of how the first five levels of the visible order book in a Crude Oil futures contract at a hypothetical moment in time could be visualized:

| Price | Buy Orders | Buy Lots | Sell Orders | Sell Lots |
|---|---|---|---|---|
| **6505** | | | 17 | 18 |
| **6504** | | | 21 | 22 |
| **6503** | | | 21 | 23 |
| **6502** | | | 12 | 12 |
| **6501** | | | **6** | **11** |
| **6500** | **4** | **4** | | |
| **6499** | 13 | 13 | | |
| **6498** | 17 | 23 | | |
| **6497** | 26 | 36 | | |
| **6496** | 17 | 25 | | |

27. An "aggressive" order is an order that crosses, or aggresses, the bid-ask spread in order to execute a trade. An aggressive buy order is a bid placed at the best-ask price or higher, i.e., an order to buy at a price at which at least one other trader is currently willing to sell. An aggressive sell order is an offer placed at the best-bid price or lower, i.e., an order to sell at a price at which at least one other trader is currently willing to buy. Using the example above, an aggressive buy order would be placed at 6501 (or higher if the best ask moved up) and an aggressive sell order would be placed at 6500 (or lower if the best bid moved down).

28. A "resting" order, by contrast, does not cross the bid-ask spread. A resting buy order is a bid placed at the best-bid price or lower, i.e., an order to buy at a price that is lower than the price that other traders are currently willing to sell. A resting sell order is placed at the best-ask price or higher, i.e., an order to sell at a price that is higher than the price that other traders are currently willing to buy. Using the example above, a resting buy order would be placed at 6500 or lower and a resting sell order would be placed at 6501 or higher.

C.    **How Futures Markets Respond to Order Activity**

29.    All else being equal, in futures markets—including the crude oil futures market—prices will generally rise when there is more interest in buying a particular contract (i.e., the demand side) than there is in selling (i.e., the supply side); conversely, prices will generally fall when supply exceeds demand (i.e., there is more interest in selling than buying).

30.    Many market participants incorporate these general supply and demand concepts into their trading decisions.  Market participants consider, for example, liquidity and market depth—i.e., the volume of lots and orders at various prices of the visible order book—to determine whether there is generally more interest to buy or to sell in the market at any given time, and thus whether a corresponding price change is likely.  Market participants also consider "order book balance" or "order book pressure"—i.e., the ratio of lots and orders on the bid side of the market to the lots and orders on the offer side of the market.  Many market participants use automated trading systems that analyze the market for imbalances in the order book and use that information to inform trading decisions.

31.    For instance, if there are substantially more lots and/or orders on the bid side than on the offer side, market participants may reasonably believe that there is more interest to buy than to sell, and thus infer that a price increase is likely.  These market participants may then trade accordingly, and some may attempt to buy lots before the expected price increase.  In such a case, these market participants would place aggressive buy orders (i.e., at a higher price than the currently resting buy orders in the market), making execution of resting sell orders more likely.

D.    **Mechanics of Spoofing in Futures Markets**

32.    Spoofing and related manipulative or deceptive trading strategies seek to take advantage of these market fundamentals and market participants' reactions to them.  This might

be done, for example, by placing one or more resting orders (which the trader intends to execute) on the sell side of the market, and then placing one large order or a series of relatively large orders (which the trader intends to cancel before execution) on the buy side. The large orders on the buy side would create an order book imbalance and convey a false appearance that there is more interest to buy than to sell in the market. This might deceive other market participants into trading at a time, price, or quantity they otherwise would not have, in a way that benefits the trader. In this example, the trader's large buy orders could deceive other market participants into placing aggressive orders to buy, thus moving the price higher and allowing the trader's sell orders to be executed sooner, at a better price, and/or in larger quantities than they otherwise would have been executed. Once the trader executes his desired sell orders, he would cancel the larger orders on the other side of the market.

## VII.  BANOCZAY'S MANIPULATIVE AND DECEPTIVE SCHEME

### A.  Banoczay's Trading and Overview of Spoofing Scheme

33.    From approximately October 31, 2013, through April 19, 2018, Banoczay Sr. held trading accounts at a futures commission merchant based in Chicago, Illinois. These accounts included a primary account in the name of Banoczay Sr., and two sub-accounts, one in the name of Banoczay Sr. and another in the name of BAZUR (together, the "Futures Trading Accounts"). According to paperwork filed with the futures commission merchant, both sub-accounts authorized "Roman Banoczay" to act as financial advisor and exercise discretionary trading authority over them.

34.    Banoczay entered orders and executed trades through the Futures Trading Accounts and, upon information and belief, was the only person who did so. During the Relevant Period, Banoczay traded manually, by submitting orders, cancelations, and modifications using a computer mouse or keyboard. Banoczay traded in the Futures Trading

11

Accounts on his own behalf, and on behalf of Banoczay Sr. and BAZUR. Upon information and belief, Banoczay Sr. and BAZUR authorized and were aware of Banoczay's trading. Banoczay was an agent of both BAZUR and Banoczay Sr., and all of his trading in the Futures Trading Accounts was conducted within the scope of and in furtherance of that agency.

35.     During the Relevant Period, Banoczay engaged in a manipulative and deceptive scheme (the "Scheme") that consisted of spoofing the crude oil futures market on CME's Globex electronic trading platform. When he engaged in the Scheme, Banoczay knew or was reckless to the fact that his spoof orders would send false signals of increased supply or demand (i.e., increased selling or buying interest) into the market and would deceive or trick other market participants.

36.     Banoczay's turn to spoofing came amid a string of significant trading losses that he incurred in January 2018. Specifically, he lost more than $289,000 on January 10, more than $624,000 on January 24, and more than $87,000 on January 26.

37.     In the face of these losses, Banoczay started implementing and refining a spoofing strategy. Banoczay began to spoof on January 16, and from that point through the end of that month, he engaged in between six and sixty-one spoofing events each day.

38.     Banoczay often spoofed into and out of corresponding positions in the market—in other words, in several instances Banoczay bought a long position in the market through spoofing, and then offset that long position by spoofing to sell a corresponding short position. This behavior earned Banoczay a profit based on the difference in price between his buy and sell. In early February, Banoczay's spoofing accelerated. By February 2, he started spoofing consistently and increasingly, executing seventy-six to 332 spoofing events per day until

12

February 12, when he engaged in more than 700 spoofing events in a single day. After that, his futures commission merchant put a hold on his account.

39.     During the Relevant Period, Banoczay engaged in more than 2,000 distinct spoofing events. These 2,000-plus events encompassed 19,100 individual spoof orders.

40.     Banoczay's sudden and substantial reliance on spoofing was successful in helping to offset his earlier trading losses. For example, during his most intense spate of spoofing, from February 2 through February 12, he earned more than $332,000 in profits over just eight days of trading.

**B.     Banoczay's Spoofing Technique**

41.     Banoczay's Scheme followed a general pattern: (i) placing a small order (between one and forty lots) for Crude Oil futures that he intended to execute ("Genuine Orders"); (ii) within seconds before or after entering a Genuine Order, placing a series of much larger resting orders (almost 97% of which were forty lots each) in rapid succession at various price levels on the opposite side of the market, which he intended to cancel before execution ("Layered Spoof Orders"); and (iii) canceling his Layered Spoof Orders within seconds of his Genuine Order being filled.

42.     Banoczay's Scheme was designed to benefit financially from market participants' reaction to his Layered Spoof Orders. The following is a simplified explanation of how his Scheme was intended to work, using a hypothetical example of Layered Spoof Orders on the buy side. Banoczay would place a series of large (almost exclusively 40-lot) Layered Spoof Orders to buy that would result in an increase in demand in the order book (i.e., create or add to an order book imbalance in which orders to buy outweigh orders to sell). This increase would be visible to other market participants and may lead them to conclude that the price is likely to rise. This conclusion, in turn, would impact market participants' decisions, including prompting some to

attempt to purchase contracts before the predicted rise in price happens. In such a case, these participants would place aggressive orders to buy (i.e., at a higher price than the currently resting bids in the market), which would enable orders on the opposite side of the Layered Spoof Orders—including Banoczay's Genuine Orders—to sell sooner, at a better price, or in larger quantities than they otherwise would.

43. Banoczay's Genuine Order and Layered Spoof Orders were active simultaneously on opposite sides of the market, but, as noted above, the Layered Spoof Orders encompassed a far greater total volume than the Genuine Order—the average ratio of Layered Spoof Order lots to Genuine Order lots for events was more than 8.7-to-1, and in each event Banoczay created an imbalance of *at least* 100 lots between his Layered Spoof Orders and Genuine Orders. Thus, Banoczay intended his spoofing activity to put pressure on the price in the direction of his Genuine Order and to deceive or trick other market participants into filling his Genuine Order at his desired price.

44. Banoczay designed the Scheme to ensure his Layered Spoof Orders were canceled prior to execution while his Genuine Orders were executed at a high rate. His Scheme worked as designed, as reflected in vastly diverging rates in which Banoczay's Genuine and Layered Spoof Orders were partially or fully filled (the "hit rate"). As shown in the table below, Banoczay placed 2,346 Genuine Orders during the Relevant Period. Of these, about 69% were hit. By contrast, less than 2% of the 19,100 Layered Spoof Orders were hit. Although more than 97% of Banoczay's Layered Spoof Orders were 40-lot orders, as a general matter, whether an order is hit is not dependent on its size; rather, orders at the same price level execute according to time priority under the FIFO matching algorithm, and larger orders can receive what is called a partial fill (i.e., only ten lots of a 40-lot order could be filled, leaving thirty lots on the market).

14

Here, the stark contrast in hit rates illustrates Banoczay's success in avoiding execution of his Layered Spoof Orders.

| Orders Hit in Events (percentages are approximate) | | | |
|---|---|---|---|
| | Total Orders in Events | Number of Orders Hit | Percentage of Orders Hit |
| Genuine Orders | 2,346 | 1,627 | 69% |
| Layered Spoof Orders | 19,100 | 249 | <2% |

45.     Thus, while Banoczay canceled almost 99% of his 19,000-plus Layered Spoof Orders before even a partial fill, the Scheme enabled him to successfully fill, either partially or completely, approximately 69% of his Genuine Orders during spoofing events.  Furthermore, before the Relevant Period, Banoczay rarely used 40-lot orders—placing just over 1,000 such orders in the preceding *four years*.  Banoczay's limited use of 40-lot orders before the Relevant Period when compared to his use and cancelation of *thousands* of such orders during the Relevant Period demonstrates the differing intent behind his Layered Spoof Orders and Genuine Orders (i.e., Banoczay only wanted his Genuine Orders to be filled).

46.     Banoczay also took steps to protect his Layered Spoof Orders from execution. For example, he canceled the Layered Spoof Orders rapidly after placing them.  As illustrated in the table below, the median cancelation time for all of his Layered Spoof Orders was 6.2 seconds, and for Layered Spoof Orders at the top level of the book (i.e., those in most danger of being hit), the median cancellation time was just 4.3 seconds.  By contrast, on those rarer occasions when Banoczay canceled his Genuine Orders, the median cancelation time was 22.7 seconds.  Similarly, on the relatively rare occasion that he used 40-lot orders prior to his Scheme,

15

the median cancellation time for those orders was 48.6 seconds.  This means that Banoczay
allowed Genuine Orders and pre-Scheme 40-lot orders to rest prior to cancelation for a
significantly longer period than his Layered Spoof Orders.  The consistently fast cancelation
times for Banoczay's Layered Spoof Orders reflect his intent to cancel them from the outset.

| Cancelations of Event Orders (values are approximate) | |
| --- | --- |
| | Median Time to Cancelation |
| Layered Spoof Orders (All) | 6.23 seconds |
| Layered Spoof Orders (Top Level of Book) | 4.3 seconds |
| Genuine Orders | 22.7 seconds |
| 40-Lot Orders (Before Relevant Period) | 48.6 seconds |

47.    By engaging in the Scheme as described herein, Banoczay entered Layered Spoof
Orders either to intentionally send a false signal to the market that he actually wanted to buy or
sell the number of contracts specified in those orders, or while recklessly disregarding the fact
that entering these orders would send such a false signal—a signal that injected false information
about supply and demand into the market.  Banoczay knew or recklessly disregarded that the
false information about supply and demand would lure market participants to trade against his
Genuine Orders on the opposite side of the market—allowing them to fill sooner, at a better
price, or in larger quantities than they otherwise would.

48.    The risk that his Layered Spoof Orders could mislead other market participants
into believing there was genuine supply or demand was so obvious that Banoczay must have
been aware of it.  He knew that his Layered Spoof Orders would appear in the order book and

that traders often consider order book information in making trading decisions.  Although Banoczay's Layered Spoof Orders were visible to the rest of the market, his identity as the originator of those orders was not.  Accordingly, Banoczay knew that other market participants could not see that the same trader had placed all of the Layered Spoof Orders, or that the same trader had placed the Layered Spoof Orders and the Genuine Orders, which might have tipped off market participants that his Layered Spoof Orders were not bona fide.  Thus, Banoczay was, at least, reckless with respect to the danger that his Layered Spoof Orders would mislead other market participants.

49.     Virtually all of Banoczay's 19,100 individual Layered Spoof Orders— encompassed within 2,000-plus distinct spoofing events—were canceled immediately before or after a fill of a Genuine Order.  The predictable sequence inherent in Banoczay's spoofing pattern, repeated over and over in a span of just 27 days, demonstrates that Banoczay was not reacting to market changes when he canceled his Layered Spoof Orders; rather, he was carrying out a predetermined strategy that was not dependent on market conditions.

C.     **Examples of Banoczay's Spoofing Scheme**

50.     A few examples of Banoczay's spoofing activity are illustrated below.  All of these examples share a common theme that is generally consistent with Banoczay's spoofing activity throughout the Relevant Period:  Banoczay placed a small Genuine Order on one side of the market, quickly preceded or followed by a set of much larger Layered Spoof Orders on the opposite side of the market.  These Layered Spoof Orders created or exacerbated a significant market imbalance (and concomitant price pressure) and were cancelled within close proximity of the Genuine Order being filled.

1.    *Event Example 1: January 25, 2018*

51.    On January 25, 2018, between 06:31:40.482 and 06:31:44.386 a.m., Banoczay sold ten lots of the Crude Oil futures contract with March 2018 expiry at a price of $66.31 per barrel.  Around the same time, Banoczay placed a Genuine Order to buy ten lots of the same contract at $66.29.[4]  In light of his *sale* of ten lots at $66.31 per barrel, if Banoczay was able to fill his Genuine Order to *buy* ten lots at $66.29, he would make an immediate profit of $0.02 per barrel.  However, at the time of his final modification to his Genuine Order to buy, the best bid was $66.30, meaning that Banoczay would not be able to fill his Genuine Order unless there was sufficient selling interest such that all of the bids at $66.30 and all of the bids in front of him in the queue at $66.29 were either filled or canceled.

52.    Approximately 1.2 seconds after finalizing his Genuine Order to buy, at 06:31:45.692 a.m., Banoczay began entering a series of much larger 40-lot Layered Spoof Orders on the sell side of the market in order to put downward pressure on the price so that his Genuine Order to buy would be executed at its resting price.  Specifically, within approximately eight seconds (between 06:31:45.692 and 06:31:53.557 a.m.), Banoczay placed nine distinct Layered Spoof Orders, each to sell forty lots of the Crude Oil futures contract.  Banoczay placed these orders at the following prices, in sequence:  $66.36, $66.35, $66.34, $66.33, $66.32, $66.31, $66.31, $66.30, $66.30.  Banoczay canceled his first Layered Spoof Order at $66.31about one second after placement, and did the same with his first Layered Spoof Order at $66.30, canceling it within 400 milliseconds after placement.  In other words, in a span of seconds, Banoczay placed one bid to buy a total of ten lots, and nine offers to sell a total of 360 lots.  At their peak, Banoczay's own orders constituted a seven-to-one ratio of offers to bids, and

---

[4] Banoczay initially placed his Genuine Order to buy at a different quantity and price, and modified it on multiple occasions before finalizing it at 06:31:44.504 a.m.

a 28-to-1 ratio of lots to sell versus lots to buy, creating a significant order imbalance on the book.

53.     Banoczay's attempt to put downward pressure on the price and stimulate selling interest was successful.  Between the placement of his first and fifth Layered Spoof Orders, all resting buy orders at $66.30 were canceled or executed, and the best bid moved down to $66.29, the price of Banoczay's resting Genuine Order to buy.  As Banoczay continued to place Layered Spoof Orders to sell, the liquidity available (i.e., the number of resting orders) at $66.29 continued to fall, which brought Banoczay's resting Genuine Order closer to the front of the queue.

54.     Finally, at 06:31:53.559 a.m.—about two milliseconds after Banoczay placed his final Layered Spoof Order to sell—his 10-lot Genuine Order to buy was fully filled.  Within 400 milliseconds of the fill, Banoczay began canceling all seven of the remaining 40-lot offers he had just finished placing, a process he completed in just over three seconds.  He began at 06:31:53.948 a.m. by canceling the offer at $66.30 per barrel, which was by then the third best offer price.  Between 06:31:54.072 and 06:31:56.953 a.m., a span of less than three seconds, Banoczay canceled his remaining Layered Spoof Orders at $66.36, $66.35, $66.34, $66.31, $66.32, and $66.33, respectively.[5]

55.     In summary, while waiting for a fill on his Genuine Order to buy ten lots at his desired (lower) price, Banoczay put downward pressure on the price by placing a total of nine offers to sell a total of 360 lots, which he intended to cancel, and which he did cancel without any lots being filled.

_____

[5] Banoczay first modified his 40-lot orders at $66.36, $66.35, and $66.34, respectively down to twenty lots, before canceling them between 06:31:54.072 and 06:31:54.105 a.m.

56.     Banoczay's Layered Spoof Orders were disproportionate to the rest of the market and created a significant market imbalance between total bids and offers.  At 06:31:53.557 a.m., the volume of offers in the market at the five lowest price levels was 537 lots, 200 of which were offered by Banoczay.  Banoczay also had 40-lot offers on the order book at the next two highest price levels, accounting for eighty of the 260 lots offered at those price levels.  On the buy side, there were 363 lots at the five-highest price levels, including Banoczay's 10-lot bid.  In other words, within five price levels from the best bid and offer, Banoczay's orders represented 37.2% of the sell-side (i.e., his spoof side) and just 2.8% of the buy-side (i.e., his genuine side). Excluding Banoczay, all traders in the market had 4.7% more bids than offers (353 lots bid against 337 lots offered).  Including Banoczay, all traders in the market had 47.9% more offers than bids (537 lots offered against 363 lots bid).  In other words, the bid and ask/offer sides of the market would have been relatively balanced were it not for Banoczay's Layered Spoof Orders.

2.     *Event Example 2:  February 1, 2018*

57.     On February 1, 2018, at 02:10:26.943 a.m., Banoczay sold ten lots of the Crude Oil futures contract with March 2018 expiry at a price of $64.75 per barrel.  Less than three seconds later, Banoczay placed a Genuine Order to buy ten lots of the same contract at a price of $64.73 per barrel.[6]  In light of his previous sale of ten lots at $64.75 per barrel, if Banoczay was able to fill his Genuine Order to buy ten lots at $64.73, he would make an immediate profit of $0.02 per barrel.  However, at the time that he modified the order, the best bid was $64.75, meaning that Banoczay would not be able to fill his Genuine Order unless there was sufficient

_____

[6] As with Example 1, Banoczay initially input this order at a different quantity and price, and modified it multiple times before finalizing it at 02:10:29.657 a.m.

selling interest such that all of the bids at $64.75 and $64.74—and all of the bids in front of him in the queue at $64.73—were either filled or canceled.

58.     Less than six seconds after modifying the Genuine Order, at 02:10:35.632 a.m., Banoczay began entering a series of much larger 40-lot Layered Spoof Orders on the sell side of the market in order to put downward pressure on the price so that his Genuine Order to buy would be executed at its resting price.  Specifically, within approximately six seconds (between 02:10:35.632 and 02:10:41.857 a.m.), Banoczay placed twelve distinct Layered Spoof Orders, each to sell forty lots of the Crude Oil futures contract.  Banoczay placed these orders at the following prices, in sequence:  $64.85, $64.84, $64.83, $64.82, $64.81, $64.80, $64.79, $64.78, $64.77, $64.76, $64.75, $64.74.  In other words, in a span of seconds, Banoczay placed one bid to buy a total of ten lots, and twelve offers to sell a total of 480 lots.  Banoczay's own orders constituted a 12-to-1 ratio of offers to bids, and a 48-to-1 ratio of lots to sell versus lots to buy, creating a significant order imbalance on the book.

59.     Banoczay's attempt to put downward pressure on the price and stimulate selling interest was successful.  All resting buy orders at $64.75 were executed or canceled, which moved the best bid down to $64.74, one tick away from Banoczay's resting Genuine Order to buy.  As Banoczay continued to place Layered Spoof Orders to sell, the liquidity available at $64.74 fell until the best bid moved down to $64.73.  As liquidity continued to fall further at $64.73, Banoczay's resting Genuine Order moved closer to the front of the queue.

60.     Finally, at 02:10:41.859 a.m.—about two milliseconds after Banoczay placed his twelfth Layered Spoof Order to sell—his ten-lot Genuine Order to buy was fully filled.  Within 350 milliseconds of the fill, Banoczay began canceling all twelve of the 40-lot offers he had just

finished placing, a process he completed within five seconds.[7]  He began at 02:10:42.199 a.m. by canceling the offer at $64.74 per barrel, which was by then the best offer price.  Between 02:10:42.366 and 02:10:42.414 a.m., a span of less than 100 milliseconds, he canceled all of the offers between $64.79 and $64.85, and between 02:10:44.455 and 02:10:46.265 a.m., he canceled his 40-lot offers at $64.75, $64.76, $67.77, and $64.78 per barrel.

61.     In summary, while waiting for a fill on his Genuine Order to buy ten lots at his desired (lower) price, Banoczay put downward pressure on the price by placing twelve offers to sell a total of 480 lots, which he intended to cancel, and which he did cancel without any lots being filled.

62.     Here again, Banoczay's Layered Spoof Orders were disproportionate to the rest of the market and created a significant market imbalance between total bids and offers.  At 02:10:41.857 a.m., the volume of offers in the market at the five lowest price levels was 547 lots, 200 of which were offered by Banoczay.  Banoczay also had 40-lot offers on the order book at the next five highest price levels, accounting for 200 of the 592 lots offered at those price levels.  On the buy side, there were 309 lots bid at the five-highest price levels, including Banoczay's 10-lot bid.  In other words, within five price levels from the best bid and offer, Banoczay's orders represented 36.6% of the sell-side (i.e., his spoof side) and just 3.2% of the buy-side (i.e., his genuine side).  Excluding Banoczay, all traders in the market had 16.1% more lots offered than lots bid (347 lots offered against 299 lots bid).  Including Banoczay, all traders in the market had 77.0% more offers than bids (547 lots offered against 309 lots bid).  Once again, the bid and ask/offer sides of the market would have been significantly more balanced were it not for Banoczay's Layered Spoof Orders.

---

[7] Banoczay modified four of his Layered Spoof Orders to sell down to twenty lots before canceling immediately after.

3. *Event Example 3: February 12, 2018*

63. On February 12, 2018, at 03:02:13.105 a.m., Banoczay began entering a series of 40-lot Layered Spoof Orders to buy Crude Oil futures contracts with March 2018 expiry in order to put upward pressure on the price. Specifically, within approximately six seconds (between 03:02:13.105 and 03:02:18.875 a.m.), Banoczay placed eight distinct Layered Spoof Orders, each to buy forty lots of the Crude Oil futures contract. Banoczay placed these orders at the following prices, in sequence: $60.38, $60.39, $60.40, $60.41, $60.42, $60.43, $60.44, $60.40. At the start of the first order, the best bid was $60.45 per barrel and the best offer was $60.46 per barrel.

64. Banoczay's attempt to put upward pressure on the price and stimulate buying interest was successful. Between the placement of his first and third Layered Spoof Orders, the liquidity available at $60.45 completely disappeared, and the best bid moved up to $60.46.

65. At 03:02:18.576 a.m., within 1.2 seconds after the seventh of his eight Layered Spoof Orders to buy, Banoczay placed a Genuine Order to sell forty lots of the same contract at a price of $60.46 per barrel.[8] At the time, the best bid was $60.46 per barrel and the best offer was $60.47 per barrel, meaning that Banoczay's sale was an aggressive offer that crossed the bid-ask spread. The order was fully filled within one millisecond. At the time of the placement of the Genuine Order, Banoczay's own orders constituted a 7-to-1 ratio of bids to offer, creating a significant order imbalance on the book.

66. Within 320 milliseconds of the final fill on the Genuine Order to sell, Banoczay began canceling all eight of the 40-lot bids he had placed, a process he completed in less than 2.5

---

[8] Banoczay's eighth and final Layered Spoof Order was placed less than 300 milliseconds *after* he filled his 40-lot aggressive Genuine Order to sell on the opposite side, however he canceled it within 2.358 seconds.

seconds. He began at 03:02:18.894 a.m., by first canceling the bid at $60.38 per barrel.[9] The remaining seven Layered Spoof Orders were canceled in a span of four milliseconds, between 03:02:21.229 and 03:02:21.233 a.m.

67.     In summary, in order to move the price up to aggressively sell at $60.46, Banoczay placed a total of eight bids to buy a total of 320 lots, which he intended to cancel, and which he did cancel without any lots being filled.

68.     Once again, Banoczay's Layered Spoof Orders were disproportionate to the rest of the market. At 03:02:17.383 a.m., the volume of bids in the market at the five highest price levels was 291 lots, 120 of which were from Banoczay. Banoczay also had 40-lot bids on the order book at the next four highest price levels, accounting for 160 of 287 lots bid at those price levels. On the sell side, there were 290 lots offered at the five lowest price levels, none of which were Banoczay's. In other words, within five price levels from the best bid and offer, Banoczay's orders represented 41.2% of the buy side (i.e., his spoof side) and none of the sell side. Excluding Banoczay, all traders in the market had 69.6% more offers than bids (290 lots offered against 171 lots bid). Banoczay's spoof orders eliminated this divergence such that the entire market had almost the same number of lots offered as lots bid (290 lots offered against 291 lots bid).

69.     Approximately 1.2 seconds after Banoczay canceled his last Layered Spoof Order to buy, and within four seconds of executing his Genuine Order to sell at $60.46, Banoczay reversed course and began entering a series of 40-lot Layered Spoof Orders to now sell Crude Oil futures contracts with the same expiry in order to, this time, put downward pressure on the price. Specifically, within approximately five seconds (between 03:02:22.251 and 03:02:27.305

---

[9] Banoczay first modified the order down to twenty lots before canceling it 18 milliseconds later.

a.m.), Banoczay placed eight distinct Layered Spoof Orders, each to sell forty lots of the Crude Oil futures contract. Banoczay placed these orders at the following prices, in sequence: $60.53, $60.52, $60.50, $60.49, $60.48, $60.47, $60.46, $60.50.[10] At the start of the first order, the best bid was $60.43 per barrel and the best offer was $60.44 per barrel.

70. Banoczay's attempt to put downward pressure on the price and stimulate selling interest was successful, but not sustained. Approximately seven milliseconds after his sixth Layered Spoof Order, the best ask moved down to $60.43 and the best bid to $60.42. However, this was short-lived, and the best ask and bid moved back up to $60.44 and $60.43, respectively, four milliseconds later. One millisecond after Banoczay's next Layered Spoof Order, at 03:02:24.980 a.m., the best ask and bid moved back down to $60.43 and $60.42, respectively, for approximately eight milliseconds, before moving back up again by $0.01 each.

71. Nevertheless, Banoczay succeeded in increasing the liquidity available at the best ask of $60.44. At 03:02:26.928 a.m., approximately two seconds after the seventh of his eight Layered Spoof Orders to sell, Banoczay placed a Genuine Order to buy forty lots of the same contract at a price of $60.44 per barrel.[11] At the time, the best bid was $60.43 per barrel and the best offer was $60.44 per barrel, meaning that Banoczay's bid was an aggressive bid that crossed the bid-ask spread. The order was fully filled within one millisecond. At the time of the placement of the Genuine Order, Banoczay's own orders constituted a six-to-one ratio of offers to bid, creating a significant order imbalance on the book.

---

[10] The first of these Layered Spoof Orders was modified down to 20 lots at 3:02:24.984 a.m., about 2.7 seconds after placement and after the placement of the seventh Layered Spoof Order, and was ultimately canceled less than 100 milliseconds later, at 3:02:25.035 a.m.

[11] Banoczay's eighth and final Layered Spoof Order was placed less than 500 milliseconds *after* he filled his 40-lot aggressive Genuine Order to buy on the opposite side, however he canceled it within 2.203 seconds.

72.     Within 430 milliseconds of the final fill on his Genuine Order to buy, Banoczay began canceling all of the 40-lot offers he had placed, a process he completed in less than three seconds.  He began at 03:02:27.351 a.m., by first canceling the bid at $60.52.[12]  The remaining six Layered Spoof Orders were canceled in a span of three milliseconds, between 03:02:29.505 a.m. and 03:02:29.508 a.m.

73.     In summary, in order to move the price down to aggressively buy at $60.44, Banoczay placed a total of eight offers to sell a total of 320 lots, which he intended to cancel, and which he did cancel without any lots being filled.

74.     Similar to the first part of this example, Banoczay's Layered Spoof Orders were disproportionate to the rest of the market and exacerbated a market imbalance.  At 03:02:24.980 a.m., the volume of offers in the market at the five lowest price levels was 347 lots, 120 of which were from Banoczay.  Banoczay also had 40-lot offers on the order book at the next five lowest price levels, accounting for 160 of 453 lots offered at those price levels.  On the bid side, there were 133 lots bid at the five highest price levels, none of which were Banoczay's.  In other words, within five price levels from the best bid and offer, Banoczay's orders represented 34.6% of the sell side (i.e., his spoof side) and none of the buy side.  Excluding Banoczay, all traders in the market had 70.7% more offers than bids (227 lots offered against 133 lots bid).  With the addition of Banoczay's spoof orders, the divergence between offers and bids increased to 161% (347 lots offered against 133 lots bid).

75.     Thus, as this example shows, within a span of seventeen seconds, Banoczay first placed a set of Layered Spoof Orders to buy 320 lots, causing upward pressure on the price so that he could place and immediately fill his aggressive Genuine Order to sell forty lots at $60.46.

---

[12] Banoczay first modified the bid at $60.52 per barrel down to twenty lots, and canceled it forty-eight milliseconds later.

Immediately following the cancelations of his Layered Spoof Orders to buy, Banoczay placed a set of Layered Spoof orders to sell 320 lots, causing downward pressure on the price so that he could place and immediately fill his aggressive Genuine Order to buy forty lots at $60.44. As a result, and as in the first two examples, Banoczay made a profit of $0.02 per barrel.

## VIII. <u>VIOLATIONS OF THE ACT AND REGULATIONS</u>

### COUNT I

### VIOLATIONS OF SECTION 4c(a)(5)(C) OF THE ACT, 7 U.S.C. § 6c(a)(5)(C) (2018)<br>(Disruptive Practices—Spoofing)

76.     The allegations set forth in paragraphs 1 to 70 are re-alleged and incorporated herein by reference.

77.     By reason of the conduct described above, Banoczay engaged in trading, practices, or conduct on or subject to the rules of a registered entity that is, is of the character of, or is commonly known to the trade as, "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution).

78.     In placing each Layered Spoof Order, Banoczay acted with the intent to cancel the bid or offer before execution.

79.     By reason of the foregoing, Defendants violated 7 U.S.C. § 6c(a)(5)(C).

80.     Banoczay is directly liable for these violations. Banoczay Sr. and BAZUR are strictly liable for these violations under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2019), because Banoczay served as their agent and committed these violations within the scope of his agency.

81.     Each Layered Spoof Order, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 6c(a)(5)(C).

## COUNT TWO

### VIOLATIONS OF SECTION 6(c)(1) OF THE ACT, 7 U.S.C. § 9(1) (2018), AND REGULATION 180.1(a)(1) AND (3), 17 C.F.R. § 180.1(a)(1), (3) (2019) (Use of a Manipulative and Deceptive Device, Scheme, or Artifice)

82.     The allegations set forth in paragraphs 1 to 76 are re-alleged and incorporated herein by reference.

83.     By reason of the conduct described above, Defendants, in connection with a contract for future delivery on a registered entity, intentionally or recklessly: (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud; or (2) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon market participants.

84.     By reason of the foregoing, Defendants violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1), (3).

85.     Banoczay is directly liable for these violations.  Banoczay Sr. and BAZUR are strictly liable for these violations under 7 U.S.C. § 2(a)(1)(B) (2018) and 17 C.F.R. § 1.2 (2019), because Banoczay served as their agent and committed these violations within the scope of his agency.

86.     Each Layered Spoof Order, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) and (3).

## IX.   RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to its own equitable powers:

A.    Find that Defendants violated Sections 4c(a)(5)(C) and 6(c)(1) of the Act,

7 U.S.C. §§ 6c(a)(5)(C), 9(1) (2018), and Regulation 180.1(a)(1) and (3),

17 C.F.R. § 180.1(a)(1), (3) (2019);

B.    Enter an order of permanent injunction restraining and enjoining Defendants and

their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active

concert with them who receive actual notice of such order by personal service or otherwise, from

violating 7 U.S.C. §§ 6c(a)(5)(C) and 9(1) and 17 C.F.R. §180.1(a)(1) and (3);

C.    Enter an order permanently enjoining Defendants and any of their affiliates,

agents, servants, employees, successors, assigns, attorneys, and persons in active concert with

them, from directly or indirectly:

1.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

2.    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for their own personal accounts or for any account in which they have a direct or indirect interest;

3.    Having any commodity interests traded on their behalf;

4.    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5.    Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6.    Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019); and

7.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9);

D.     Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

E.     Enter an order requiring Defendants, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

F.     Enter an order directing Defendants to pay civil monetary penalties to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation of the Act and Regulations, as described herein;

G.     An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2018); and

H.     An order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: September 29, 2020

Respectfully submitted,

PLAINTIFF COMMODITY FUTURES TRADING
COMMISSION

s/*Cristina Covarrubias*
Cristina Covarrubias

1155 21st Street NW
Washington, DC 20581

Brian A. Hunt *pro hac vice* pending
Trial Attorney
Email: bhunt@cftc.gov
Phone:  (202) 418-5095

Ilana Waxman, *pro hac vice* pending
Trial Attorney
Email: iwaxman@cftc.gov
Phone: (202) 418-5867

Daniel C. Jordan, *pro hac vice* pending
Chief Trial Attorney
Email: djordan@cftc.gov
Phone: (202) 418-5339

Cristina Covarrubias (Local Counsel)
Trial Attorney
Illinois Bar # 6305668
Email: ccovarrubias@cftc.gov
Phone: (312) 596-0587